IN THE UNITED STATES DISTRICT COURT   **FILED**
FOR THE NORTHERN DISTRICT OF ALABAMA DEC 22 PM 4: 14
SOUTHERN DIVISION
U.S. DISTRICT COURT
N.D. OF ALABAMA

IRA CRAIG,                          )
                                    )
                Plaintiff           )
                                    )
        vs.                         )        CASE NO. CV98-HGD-1269-S
                                    )
ROHN, INC.,                         )
                                    )
                Defendant           )      **ENTERED**

                                           DEC 2 2 1999

## MEMORANDUM OPINION

        This above-entitled civil action is before the court on the motion for summary judgment filed

by defendant ROHN, Inc. [Document #20]. The plaintiff in this matter, Ira Craig, claims that while

an employee of the defendant, ROHN, Inc., he was the victim of race discrimination and retaliation

for opposing alleged unfair employment practices committed by the defendant. [Document #1]. The

defendant has filed an answer to plaintiff's complaint [Document #2] and now moves for summary

judgment. Plaintiff opposes this motion. [Document #30]. The court makes the following findings

of fact and conclusion of law.


### The Complaint

        Plaintiff alleges that he began work as an employee of ROHN, Inc., in November 1996 as

a second shift storage department helper. Plaintiff claims that, while employed at ROHN, he was

discriminated against in his job, work and shift assignments, and terminated on December 30, 1997,

all because of his race. Prior to his termination, based on what he perceived to be discriminatory

practices by the defendant during the course of plaintiff's employment with ROHN, plaintiff filed

a complaint with the Equal Employment Opportunity Commission (EEOC) on September 25, 1997.

A copy of that complaint was served on a representative of ROHN, Mark Bria, on October 10, 1997.

Because of an on-the-job injury, plaintiff was absent from work in October, November, and

part of December 1997. Plaintiff states that he returned to work on December 22, 1997, and was

terminated on December 30, 1997, for allegedly not working his scheduled hours on December 29,

1997. Craig further asserts that he was not told to come to work early or to work late on that date

in order to assist in taking inventory. He claims that the reason for his dismissal is pretextual and

that he was terminated for filing the EEOC complaint on September 25, 1997.

## The Answer

The defendant, ROHN, Inc., in addition to a general denial of plaintiff's claims, asserts that

plaintiff was not terminated based on any racial or retaliatory animus, but for job abandonment for

failing to complete his scheduled shift. It further states that, even if plaintiff's dismissal was based

on impermissible considerations, it would have terminated plaintiff even without these

considerations, based on other, legitimate, reasons.[1]

---

[1] It is unclear as to what these "other" reasons are. Though defendant's factual synopsis alleges that plaintiff used inappropriate language toward ROHN personnel and had to be escorted out of the facility by a security guard when informed of his firing, the defendant never argued this event as a separate basis for termination.

2

## The Motion for Summary Judgment

In its motion for summary judgment, defendant sets forth what it asserts is the evidence in this case viewed in the light most favorable to the plaintiff.[2] According to the defendant, the plaintiff is a 36-year-old black male who began working for the defendant in November 1996. The defendant is engaged in the manufacturing of towers, shelters, and cabinets for the communications industry.

### A. Work History and Termination of Plaintiff

When hired, plaintiff was assigned to what was then called the second shift, in the Stores Department. His supervisor was Ron Morgan. At that time, the defendant operated two shifts. The second shift worked from 4:00 p.m. to 3:00 or 3:30 a.m. In January 1997 a third shift was created, and the time for the operation of the other shifts was altered. The second shift was changed to operate from 3:00 p.m. to 11:30 p.m. Plaintiff's supervisor on the second shift changed at this time to Eddie Bryan.

The change in the shift times had an adverse effect on plaintiff because he needed to pick up his children from school at 3:00 p.m. Defendant allowed plaintiff to pick up his children and come to work after 3:00 p.m. on 25 occasions from January 19 through March 7, 1997. After March 7, 1997, plaintiff began working on the first shift.

Plaintiff first began working on the first shift (7:00 a.m. to 3:00 p.m.) on March 10, 1997. His supervisor for this shift was Kel Barnes. Craig had injured his back on February 16, 1997, while still working on the second shift. He missed two or three days of work as a result. However, in the

---

[2] The court views the evidence in this case in the light most favorable to the plaintiff to the extent that the record reflects the existence of facts referenced or relied upon by either party. To the extent the court is unable to confirm the existence of any fact asserted by either party, it will so state below and will not assume as true any assertion unsubstantiated by the evidentiary submissions of the parties.

fall of 1997, now working the first shift, plaintiff began having leg problems which he believed to be related to his February 1997 injury. As a result, he was absent for a large number of work days. On November 5, 1997, plaintiff received written permission from Dr. Nadeen Akhtar to return to work as of Friday, November 7, 1997, with "no restrictions." Plaintiff did not return to work on that date. He also did not return on Monday, November 10, 1997, or Tuesday, November 11, 1997. Defendant asserts that plaintiff did not call in to notify ROHN that he would not be at work on those days.

ROHN has a written set of plant rules. These rules require that, when absent or late, an employee must give notice as far in advance as possible by telephone by no later than one hour after his shift starts. These rules further provide that, if an employee is absent without excuse for three consecutive days, he will be discharged.

Defendant states that on November 12, 1997, Mark Bria, ROHN's personnel manager, called plaintiff by telephone to discuss his three consecutive unexcused absences which the defendant alleges occurred on November 7, 10, and 11, 1997. Bria testified that he advised plaintiff that he needed to get an excuse covering those days and that he could be terminated if he did not. Bria testified that he also had another conversation with plaintiff on November 26, 1997. During that conversation, plaintiff did not advise him that he had been released by his doctor to return to work. Bria, however, testified he advised plaintiff that, in order to return to work, he would need to provide the company with a medical release.[3]

---

[3] While it appears that plaintiff was released to return to work by Dr. Emily Riser on the day of this conversation (November 26, 1997), it also appears, based on the record submissions, that plaintiff did not mention this in his conversation with Bria. This oversight could have been accidental, intentional, or because the plaintiff had not yet received the release at the time of this conversation. Because Bria testified that plaintiff did not tell him he had been released to return to work as of that date, the court assumes that Bria was telling plaintiff that he needed a release from

4

Bria further stated that when the company did not receive the requested excuse from the plaintiff for his November 7-11 absences by December 2, 1997, he wrote a letter to plaintiff summarizing their conversations regarding plaintiff's absences. In this letter he advised plaintiff that he needed to produce documentation from his treating physician saying that he had been under a doctor's care and was unable to work during this period of time and that he was now able to work. Bria advised plaintiff he would be reinstated in his job if this documentation was provided. If not, he would be terminated. Bria also enclosed a medical records release form so that ROHN could obtain "pertinent information" regarding plaintiff's injury.

On or about December 11, 1997, plaintiff obtained a letter from Dr. Emily Riser, stating that plaintiff had been under her care for lower back pain since October 31, 1997, and that he had been released to work on November 26, 1997, "with no restrictions." Plaintiff presented this letter to Bria on December 11, and Bria allowed plaintiff to return to work. Plaintiff returned to work on December 16, 1997.[4]

Plaintiff was sent to a company doctor after his return. On December 23, 1997, Dr. R. Cem Cezayiril wrote a letter stating that he had examined plaintiff and that plaintiff was having burning pains in his left leg. The physician did not recommend surgery for this condition but recommended that he take an over-the-counter pain reliever and receive physical therapy. He also stated that it was safe for plaintiff to return to work without restrictions at that time,

---

his physician at whatever point he was released to return to work.

[4] There is nothing in the record excerpts to reflect why plaintiff did not return to work until December 16, 1997.

5

ROHN began taking its year-end inventory on December 29, 1997. The Stores Department has the primary responsibility for taking inventory. During the inventory process, employees in the Stores Department are required to work extended hours. Plaintiff's supervisor at that time, Kel Barnes, testified that, in a meeting held the week before the inventory was to begin, he advised first shift employees that the inventory would begin on December 29, 1997, and that employees would have to work from 6:00 a.m. to 6:00 p.m. According to defendant, plaintiff had worked two previous inventories, one in December 1996 and the other in August 1997. Defendant notes that, in his own deposition, plaintiff admitted that he and other Stores Department employees had come in early and stayed late during the two previous inventories. Based on this, ROHN infers that the plaintiff knew he was supposed to work extended hours during this inventory period.

On December 29, 1997, plaintiff did not report to work until 7:20 a.m., claiming he had overslept. He clocked out of work at 3:30 p.m. Defendant submitted testimony that plaintiff knew this was an inventory day. According to defendant, plaintiff did not have permission to leave early and was the only employee in the Stores Department to do so without supervisor approval on that date.

Plaintiff's supervisor, Kel Barnes, discovered shortly thereafter that plaintiff had clocked out early on December 29, 1997. When he made an inquiry concerning this event of the other employees, Barnes was advised that plaintiff left stating that his lawyer had told him he did not have to work beyond the hours of his regular shift. Barnes then relayed this information to Personnel Manager Mark Bria and Jim Huguenard, Human Resources Manager for ROHN. Barnes also advised them that he wished to terminate plaintiff for clocking out early, and they approved.

6

On the morning of December 30, 1997, plaintiff clocked in and was called into the office of Kel Barnes. Plaintiff was asked if he knew that he was supposed to have stayed late for inventory the previous day, to which Craig responded "no." According to Barnes, plaintiff also told him that his attorney told plaintiff that he did not have to work any hours other than from 7:00 a.m. to 3:30 p.m. Barnes then told Craig that Jim Huguenard wanted to see him.

Plaintiff met with Huguenard in the break area and was told that he was being terminated for abandoning his job.[5] According to defendant, the evidence is undisputed that, after plaintiff's termination, ROHN did not replace plaintiff with a white individual or anyone else. Defendant also points out that on December 18, 1997, twelve days before plaintiff was terminated, a white ROHN employee, Sterling Harmon, also was terminated by Huguenard for refusing to work overtime.

### B. Specific Claims of Discriminatory Treatment by ROHN

#### 1. ROHN's School Attendance Policy

Plaintiff claims that he was discriminated against by the defendant in his shift assignments. In his EEOC complaint, plaintiff stated that ROHN refused to accommodate him by allowing him to report to work approximately forty-five minutes after the second shift began and that he was taken off the second shift and replaced by a white male who wanted it and who was allowed to come to work an hour after his shift began. In his deposition, plaintiff asserts that he had to move from the second shift to the first shift so that a white employee, B. J. Banks, could be accommodated to go to school.

---

[5] Kel Barnes did not have authority to fire an employee. That authority was vested in Mark Bria and Jim Huguenard. *See* Bria Depo., pp. 14-15; Huguenard Depo., p. 83.

Defendant states that the evidence reflects that Banks was hired and assigned to work on the second shift in February 1997, the month prior to plaintiff moving or being moved to the first shift. Defendant asserts that the undisputed evidence reflects that plaintiff requested that he be moved from second to first shift and that, though plaintiff was allowed to come in late for a period of several months, this accommodation was withdrawn because ROHN's work schedule policy does not allow a flexible work schedule except in one limited circumstance. An employee is allowed to attend school under a flexible work schedule when his class schedule conflicts with his work schedule so long as his attendance does not inconvenience the company and the employee makes up the missed hours at other times during the week. Defendant identifies several employees, both white and black, who were allowed to work flexible schedules in order to attend school. All of these employees made up the time missed by either coming in to work before their shift began, staying later after their shift had ended, or working different shifts on the days when school attendance was required.

### 2. ROHN's Computer Classes

Plaintiff states that he believes he was discriminated against by the defendant because ROHN failed to allow him or the employees with less seniority than him to attend computer training classes both before and after he filed his EEOC complaint on September 25, 1997.

Defendant states that it changed to a new computer system in 1997 and thereafter conducted classes in 1997 and 1998 on its operation and on use of the computerized inventory system. In his affidavit, Mark Bria states that most ROHN employees were not allowed to attend these classes. Plaintiff did acknowledge that at least one black employee, Claude Riptoe, was allowed to attend these classes. He also admitted that he never told anyone that he needed or wanted to attend any of these classes, nor did he ever complain to management about being left out.

8

### 3. Alleged Pay Discrimination

Plaintiff claims that he was discriminated on the basis of his pay because on one occasion everyone else got a fifteen-cent pay raise and he received only five cents. Defendant asserts that when plaintiff was first hired and assigned to the second shift, his pay included a ten-cent per hour second shift premium paid to all employees on that shift.[6] When plaintiff moved to the first shift, the premium pay was not removed from his pay though defendant claims that this should have been done. Thereafter, plaintiff continued to receive the premium until he received a pay raise in August 1997. At that time, instead of the usual fifteen-cent raise, plaintiff was given a five-cent raise to eliminate the second shift premium that he had been receiving in error since he left the second shift on March 10, 1997. He was not asked to pay back the money which the defendant asserts was paid to the plaintiff in error.

### C. Retaliation Claim

Plaintiff alleges that, in addition to being treated differently and eventually terminated because of his race, he also was discharged in retaliation for: (1) submitting a claim for worker's compensation benefits on February 17, 1997; (2) filing an EEOC charge on September 25, 1997; and (3) filing a claim for unemployment compensation benefits on January 26, 1998. However, both parties agree that the worker's compensation retaliation claim is a separate lawsuit, not related to plaintiff's racial discrimination/retaliation lawsuit considered herein. Likewise, the request for

---

[6] Defendant asserts that plaintiff's testimony reflected he was aware that he received a "night shift differential" when he began to work at ROHN. However, the page of the deposition cited by the defendant is not included in the record excerpts submitted.

9

unemployment compensation benefits occurred after his termination and, therefore, cannot be the basis for a retaliatory discharge.

Plaintiff claims that evidence of discriminatory intent is shown, *inter alia*, by the fact that he was told not to wear an earring while on the job in the fall of 1997. Defendant responds that company safety policy prohibited plant employees such as plaintiff from wearing certain items, including earrings, on the job. In addition, it states that plaintiff never was written up or otherwise disciplined for violating this policy.

Based upon these facts, defendant asserts that its motion for summary judgment should be granted for several reasons. It first avers that plaintiff has failed to prove that he was intentionally discharged by the defendant on the basis of his race, arguing that Craig has failed to establish a *prima facie* case of discrimination under *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct.1817, 36 L.Ed.2d 668 (1973). It further claims that, even assuming that plaintiff has made the required *prima facie* showing, he has failed to show that defendant's asserted legitimate, non-discriminatory reason for firing him, job abandonment, was a pretext for racial discrimination. ROHN also asserts that pretext cannot be inferred because plaintiff has not shown evidence which reflects that he was treated differently from other similarly-situated white employees regarding the terms and conditions of his employment or his termination.

## Plaintiff's Response to Defendant's Motion for Summary Judgment

### A. Race Discrimination Claim

In his response to defendant's motion for summary judgment, plaintiff asserts first that there is no evidence that he was a problem employee prior to his termination. Craig notes that there is no

10

evidence he was ever written up for tardiness, attendance problems, insubordination, failing to call in on mandatory shift absences, or any other job-related problems.

Plaintiff's recitation of the facts fairly closely tracks defendant's version. However, the "spin" is different. Craig points out that he started work on the second shift at ROHN and was allowed, for a period of time, to come to work late after picking up his children from school. However, Rohn eventually withdrew its permission for plaintiff to do this. Shortly thereafter, the start time for his shift was moved from 4:00 p.m. to 3:00 p.m. Plaintiff believed that this was done with discriminatory intent.

Plaintiff claims that in March 1997, his shift was changed from second to first shift. He states that, at that time, he believed that this change was made to accommodate a white employee, B.J. Banks, so that Banks could attend school. Plaintiff also believed this was done with discriminatory animus.

Plaintiff missed two or three days in February 1997 due to an on-the-job injury. According to Craig, his back problems became more painful in October 1997. In November 1997, he was removed from the work force by his physicians. He missed work on November 5 and 6 and was to return to work on November 7. However, he was still experiencing pain and did not return or call in on Friday, November 7, or Monday, November 10, 1997. He also did not report to work on November 11, 1997. However, he states that he did call Mark Bria on that date and advised him that his neurologist still had him off work and that he would bring in the appropriate paperwork when he returned. According to plaintiff, the fact of this call is evidenced in plaintiff's Exhibit 16. Plaintiff states that he was called by Bria on November 12, 1997, and they again had a discussion

11

concerning his absences. On or about December 16, 1997, plaintiff returned to work on his regular shift performing his regular duties.

Plaintiff states that on December 29, 1997, he clocked into work at 7:20 a.m. because he had overslept. He was not issued any written disciplinary notice for this. At 3:30 p.m., he clocked out and went home. He states that prior to clocking out, no one told him that he was to work to 6:00 p.m. on that date. The following day plaintiff reported for work at his regular time of 7:00 a.m. and was terminated by Jim Huguenard shortly thereafter for allegedly abandoning his job on the day before.

Plaintiff asserts that he did not fail to comply with the call-in requirement in defendant's Work Rule VIII(4) concerning his absences of November 7, 10, and 11, 1997. He states that he called the company and spoke with Mark Bria on November 11, 1997, concerning his absences. Despite this, plaintiff alleges that Bria called him on November 12, 1997, and threatened to terminate him for his absences. According to plaintiff, Bria also sent him a letter on December 2, 1997, again threatening to terminate him for having three consecutive unexcused absences. The letter stated that ROHN would "enforce [plaintiff's] termination" if he did not provide certain information (a medical excuse) to the company. Plaintiff characterizes this letter as a threat because the defendant knew that he had called in to report his absence on November 11, 1997, and was thus not in violation of company work rules.

Plaintiff notes that he was fired for what was characterized by ROHN as job abandonment for allegedly leaving his shift early on one occasion, whereas, had he not shown up for the shift at

12

all for one or two days, this would not be considered job abandonment.[7] Plaintiff contends that he was not told to work overtime on December 29 and did not ever tell anyone in management or other fellow employees that he was not going to work overtime.

Plaintiff also states that defendant has maintained that it informed the store employees approximately one week before inventory that most of them would be required to report to work at 6:00 a.m. and that "all" employees would be required to work until 6:00 p.m. during inventory. However, according to plaintiff, the time sheets produced by defendant reflect that not all employees were required to work these extended hours. Plaintiff points, for example, to white employee R. Grills who left work at 2:17 p.m. on December 30 and arrived at 6:53 a.m. and left at 3:13 p.m. on December 31; white employee D. Goodwin who arrived at 6:58 a.m. on December 29, left at 4:43 p.m. on December 30, and arrived at 6:57 p.m. and left at 3:12 p.m. on December 31; and white employee M. Pennington who left work at 4:41 p.m. on December 30 and arrived at 6:44 a.m. and left work at 3:12 p.m. on December 31. According to plaintiff, none of these employees were disciplined, suspended and/or terminated. However, plaintiff testified that, unlike the other two inventories he had worked, he did not receive either written or oral notice that he would be required to work extended hours during this inventory. Defendant also notes that plaintiff is alleged to have stated on the day of his termination that he did not know he was supposed to have stayed late the previous day.

---

[7] Plaintiff asserts that Jim Huguenard stated that plaintiff was not terminated for job abandonment but for insubordination. However, a reading of the transcript of Huguenard's testimony does not reflect this. Huguenard testified that plaintiff was fired for job abandonment which he also considered to be an act of insubordination because plaintiff left early despite the fact that, according to Huguenard, he knew he was supposed to work late on that day.

13

Plaintiff takes issue with defendant's use of Sterling Harmon as a comparator to allegedly show that plaintiff was treated the same as a white employee who also abandoned his job. He points out that Harmon worked in the Concrete Department, not the Stores Department. Therefore, Sterling worked under a different supervisor than plaintiff. He also asserts that Harmon was not fired for the same reason as plaintiff, in that Harmon was fired for "insubordination" for refusing to remain on the job when ordered to do so and plaintiff was fired for "job abandonment" rather than insubordination.

Plaintiff claims that, while Harmon is not a proper comparator, there do exist numerous white comparators who violated the same rule that plaintiff allegedly violated but were not terminated. Some of the instances cited by plaintiff include the following white employees:

| **Name** | **Offense** |
|---|---|
| 1. R. Davidson | Leaving without notifying his supervisor and four consecutive unexcused absences. |
| 2. S. Goolsby | Three consecutive absences without a call-in. |
| 3. D. Hubbard | Failure to call in for three consecutive days. |
| 4. C. Lafiore | Leaving the job early. |
| 5. J. Sandlin | Failure to follow supervisor's instructions. |
| 6. S. Myers | Leaving work without notifying supervisor. |
| 7. M. Pickett | Absent three consecutive days. |
| 8. B. Snow | Failure to return to work. |
| 9. K. Banks | Abusive language, absent mandatory work day. |

14

Plaintiff also lists eight other white employees who missed mandatory work days or failed to work a scheduled work day but were not terminated. One of these employees, K. McCain, was absent without a call-in or missed a required work day on nine different occasions in 1997 and 1998 without termination. He also cites 10 other white employees who committed infractions of either failing to call in or using threatening or abusive language without being terminated.

Plaintiff argues that, although these individuals were under different line supervisors, none of the supervisors have the authority to terminate employees. Plaintiff surmises that since the termination of the employees cited above would have to have been approved by Huguenard or Bria, and they were not terminated, Bria and/or Huguenard made the decisions not to terminate them.[8]

### B. Retaliation Claim

Plaintiff asserts that he has made out a *prima facie* case of retaliation by showing that, immediately after filing his discrimination claim, he began to be harassed by Bria about the earring he wore to work though Bria was aware of it and had never said anything to him about it in the past. He also asserts that retaliation is evidenced by the fact that, after filing the EEOC charge, plaintiff was threatened with termination by Bria on November 12; plaintiff could not get Bria to cooperate with him on his worker's compensation claim; Bria threatened him with termination again on December 12 and then terminated his employment without justification, for the same conduct which had not resulted in the termination of white employees. Plaintiff also asserts that defendant falsely claimed that, upon clocking out on December 29, 1999, he had told other employees his lawyer told

---

[8] This reasoning, if accepted by the court, would seem to apply to Sterling Harmon also. Thus, plaintiff's argument, as understood by the undersigned, seems inconsistent.

15

him that he did not have to work late, in that the only alleged witness to this event has denied hearing plaintiff make such a statement. Plaintiff suggests that this is also evidence of pretext.

## Defendant's Response

Defendant responds by stating that none of the white employees with whom plaintiff seeks to compare himself were similarly situated to plaintiff. It also avers that plaintiff has failed to produce any evidence that defendant's legitimate, non-discriminatory reason for terminating him was a mere pretext for discrimination or any evidence that defendant retaliated against plaintiff for engaging in a protected activity.

## DISCUSSION

Summary judgment is appropriate only when there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). All the evidence and all reasonable factual inferences must be drawn in favor of the non-movant. *See Rayle Tech, Inc. v. DeKalb Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir. 1998). The plain language of Rule 56(c) mandates entry of summary judgment, after adequate time for discovery upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1989).

In order to prove disparate treatment in violation of Title VII, the plaintiff must prove by a preponderance of the evidence a *prima facie* case of employment discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d

16

(1981); *Chaney v. Southern Railway Co.*, 847 F.2d 718, 722 (11th Cir. 1988). A *prima facie* case raises the inference that discriminatory intent motivated the challenged action against the employee. The employer may rebut the presumption of discrimination by "clearly articulating in a reasonably specific manner a legitimate non-discriminatory reason for the discharge." *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1499 (11th Cir. 1985). "The defendant need not persuade the court that it was actually motivated by the proffered reasons . . . . It is sufficient if the defendant raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55, 101 S.Ct. at 1094-95. *See Chaney*, 847 F.2d at 722; *Griffin v. Carlin*, 755 F.2d 1516, 1526 (11th Cir. 1985). If he is to prevail, the plaintiff then must establish that the employer's articulated reason was a pretext for discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. at 1825; *Chaney*, 847 F.2d at 722; *Conner*, 761 F.2d at 1499. Throughout the proceeding, the plaintiff retains the ultimate burden of proving by a preponderance of the evidence the existence of purposeful discrimination. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984) ("The 'ultimate question' in a disparate treatment case is not whether the plaintiff established a *prima facie* case or demonstrated pretext, but 'whether the defendant intentionally discriminated against the plaintiff.'") (quoting *Aikens*, 460 U.S. at 714-15, 103 S.Ct. at 1481-82).

## Discriminatory Discharge Claim

Title VII provides in relevant part:

(a) It shall be an unlawful employment practice for an employer—

17

> (1) to fail or refuse to hire or to discharge any individual, or
> otherwise to discriminate against any individual with respect to his
> compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national
> origin . . . .

42 U.S.C. § 2000e-2 (1981).

The Supreme Court in *McDonnell Douglas Corporation, supra*, set forth one method of

making out a *prima facie* Title VII case:

> The complainant in a Title VII trial must carry the initial burden
> under the statute of establishing a *prima facie* case of racial
> discrimination. This may be done by showing (i) that he belongs to
> a racial minority; (ii) that he applied and was qualified for a job for
> which the employer was seeking applicants; (iii) that, despite his
> qualifications, he was rejected; and (iv) that, after his rejection, the
> position remained open and the employer continued to seek
> applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. However, the Court has made clear that its formulation was not

meant to be exclusive, and that a *prima facie* case of disparate treatment may be established in a

number of ways. *See Aikens,* 460 U.S. at 715, 103 S.Ct. at 1482 ("The *prima facie* case method . . .

was 'never intended to be rigid, mechanistic, or ritualistic'"), quoting *Furnco Construction Corp.*

*v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *McDonnell Douglas*

*Corporation,* 411 U.S. at 802, n.13, 93 S.Ct. at 1824, n.13 ("The facts necessarily will vary in Title

VII cases, and the specification above of the *prima facie* proof required from respondent is not

necessarily applicable in every respect to differing factual situations."); *Nix,* 738 F.2d at 1185 ("A

*prima facie* case of discriminatory discharge may be established in different ways.").

Although the *McDonnell Douglas prima facie* model initially was developed in the context

of a discriminatory hiring claim, the purpose underlying that method of analysis–to focus the inquiry

18

by eliminating "the most common nondiscriminatory reasons" for the employer's action, *see Burdine*, 450 U.S. at 253-54, 101 S.Ct. at 1093-94; *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984)—retains equal validity where discriminatory discipline is alleged. *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989).

The Eleventh Circuit has stated that, in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct. *Id. See also Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1984) (plaintiff alleging disparate disciplinary treatment makes out *prima facie* case of discrimination "upon a showing (1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person."); *Wilmington v. J. I. Case Co.*, 793 F.2d 909, 915 (8th Cir. 1986) ("To establish a *prima facie* case, [plaintiff] had to show that he is a member of a protected class, that he was disciplined, and that the discipline imposed was harsher than that imposed on comparably situated whites."). *Cf. Nix v. WLCY Radio/Rahall Communications*, 738 F.2d at 1185 ("a plaintiff fired for misconduct makes out a *prima facie* case of discriminatory discharge if he shows that he was qualified for the job from which he was fired, and 'that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'") (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1981)); *Green v. Armstrong Rubber Co.*,

19

612 F.2d 967, 968 (5th Cir.), *cert. denied*, 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980) ("With respect to discharge for violation of work rules, the plaintiff must first demonstrate by a preponderance of the evidence either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly.").

Plaintiff admits that he left work at 3:30 p.m. on December 29, 1997. It is also undisputed that Stores Department employees were expected to work until 6:00 p.m. on that date, though plaintiff claims he was unaware of this fact. Therefore, whether intentional or not, plaintiff did violate the work rule requiring that he work late during inventory periods.

However, plaintiff also asserts that he received disparate treatment for this violation, and he cites infractions by numerous other employees who were not discharged from their jobs as proof of this alleged discrimination. If it is assumed that the employees cited by plaintiff are indeed "similarly-situated"to him, then he has clearly established a *prima facie* case of discrimination. However, defendant disputes that the comparators used by plaintiff are, in fact, similarly-situated co-employees. It also asserts what it claims is a legitimate, non-discriminatory reason justifying plaintiff's firing.

Defendant states that plaintiff's comparators are not similarly-situated for several reasons. It claims that these employees did not work under the same supervisor as plaintiff and that the acts for which they were disciplined were not the same as that committed by plaintiff.

Plaintiff must show that the "comparables" are similarly situated in all respects. As a general rule, this means that the individuals with whom the plaintiff seeks to compare his treatment must

20

have dealt with the same supervisor,[9] have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir. 1992) (citations omitted); *Weaver v. Tech Data Corp.,* 66 F.Supp.2d 1258, 1270 (M.D.Fla. 1999).

Plaintiff cites as similarly-situated, numerous individuals who were tardy or failed to call in when absent, sometimes for several days in a row. Some of these employees worked in plaintiff's department and had the same supervisor, while some did not. Although plaintiff sees little difference between failing to call in when absent and coming in and then leaving without permission, clearly defendant did. According to the testimony submitted, ROHN, and in particular plaintiff's supervisor, saw plaintiff's action in leaving early as an act of insubordination and job abandonment. ROHN does not take this view with employees who fail to show up at work for several days in a row.[10] It considers the former to be a more egregious violation of company work rules. In addition, defendant has stated that the action by the plaintiff occurred during inventory which is a process that is extremely important to the company and which is carried out, in large part, by the Stores Department to which plaintiff was assigned. As a result, his leaving work without permission was viewed by defendant as a more egregious offense than a run-of-the-mill unexcused absence. If an

---

[9] Although the fact that different supervisors take dissimilar actions for similar conduct is not a defense to claims of race discrimination, it can suggest a basis other than race for the difference in treatments received. *Jones v. Gerwens,* 874 F.2d at 1541, n.8.

[10] Defendant also claims that plaintiff's insubordination was exacerbated by a statement he allegedly made to his co-workers, and, in particular, to a Claude Riptoe, that his lawyer had told him he only had to work his regular shift hours. Plaintiff denies making this statement and claims, in essence, that since Mr. Riptoe now denies that he ever told anyone at ROHN that plaintiff ever made such a statement, defendant must have fabricated the claim. Plaintiff argues that, in turn, this reflects that defendant's alleged non-discriminatory reason for plaintiff's termination was pretextual. However, this is not relevant unless and until plaintiff establishes a *prima facie* case of discrimination.

21

employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown. *Jones v. Gerwens*, 874 F.2d at 1540. Since plaintiff's supervisor saw this as conduct more serious than missing work altogether, the fact that plaintiff disagrees with this view is irrelevant.

In addition to employees who were tardy or absent without excuse, plaintiff also points to two who left work early without permission but were not terminated. The record reflects that both of these individuals worked in departments different from plaintiff and worked under different supervisors. Evidence that one manager is more lenient than another does not aid the plaintiff in proving that he was a victim of selective enforcement. *Id.* at 1541 (citations omitted). Thus, plaintiff is not similarly situated to these employees.

Plaintiff asserts that since Bria and Huguenard were the only persons with the authority to terminate an employee, they were the ultimate decision-makers in *all* of the cases of employee discipline cited by plaintiff because, according to plaintiff, one must necessarily conclude that the failure of a supervisor to recommend an employee's termination means that Bria and/or Huguenard must have concomitantly made a decision not to terminate him or her. However, to reach this conclusion takes a leap in logic not supported by the record.

Testimony submitted reflects that *all* discipline, short of termination, was determined and executed by the line supervisor in the department and on the shift where the disciplined employee was assigned. There is no evidence submitted to reflect that disciplinary decisions short of termination were ratified by or even brought to the attention of Bria and/or Huguenard by the line supervisors. Therefore, despite plaintiff's assertion to the contrary, one *cannot* conclude that a supervisor's decision to discipline an employee but not recommend his or her termination

22

necessarily implies that Bria and Huguenard also made a knowing decision *not* to fire the employee. If plaintiff's reasoning were to be extended to its logical end, it would mean that every decision regarding discipline by a supervisor, whether or not it involved a recommendation for termination, would, in essence, have to be approved by Bria and/or Huguenard. There is no evidence that, at the time of the alleged violations by these other employees, Bria and/or Huguenard were aware or became aware of the violations and decided to go along with the line supervisor's decision to discipline without terminating the offending employee. In fact, in the only instance where the evidence submitted by the parties reflects that an employee left an assigned shift early *and* that this fact was brought to the attention of Bria and Huguenard, the employee, who was white, was also terminated. The burden is on plaintiff to show a similarity between his conduct and that of white employees who were treated differently, rather than on the defendant to disprove their similarity. *Jones v. Gerwens*, 874 F.2d at 1541. Having failed to show that Bria and/or Huguenard were aware of the line supervisors' disciplinary actions in the situations involving other employees; plaintiff has not demonstrated that these employees were similarly situated to plaintiff.

A *prima facie* case of discrimination has not been demonstrated. As a result, it is not necessary for the court to consider whether defendant's asserted non-discriminatory reason for terminating plaintiff was a pretext for discrimination.

23

**Retaliation Claim**

To establish a *prima facie* case of discharge in retaliation for filing charges with the EEOC, a plaintiff must show (1) statutorily protected expression, (2) adverse employment action, and (3) a causal link between the protected expression and the adverse action. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991). There is no dispute that Craig has established the first two elements of a *prima facie* case of retaliatory firing. He filed a complaint with the EEOC on September 25, 1997, and a copy was served on ROHN Personnel Manager Mark Bria on October 10, 1997. On December 30, 1997, plaintiff was discharged from employment. The remaining question is whether plaintiff has established the causal link between filing the EEOC complaint and his firing.

In order to establish the requisite "causal link" required as part of a *prima facie* case, a plaintiff need only establish that "the protected activity and the adverse action were not wholly unrelated." *See EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993); *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990); *Simmons v. Camden County Bd. of Education*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985). At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. *See, e.g., Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). The defendant's awareness of the protected statement, however, may be established by circumstantial evidence. *Cf. Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992) (quoting *Visser v. Packer Engineering Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (*en banc*)) (noting that "all knowledge is inferential"), *cert. denied*, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

24

The evidence submitted reflects that ROHN Personnel Manager Mark Bria, who participated in the termination of Craig, was aware of plaintiff's EEOC complaint. In addition, although there was some controversy between plaintiff and defendant concerning certain days Craig was late for work while picking up his children from school and days he missed from work due to a back injury, he never received a written reprimand or any other disciplinary action for these tardy and missed work days. Then, after the EEOC complaint, plaintiff was terminated for violating a work rule, rather than receiving some lesser discipline. In addition, plaintiff has submitted evidence to support his claim that the defendant attempted to justify his termination by fabricating a statement he is alleged to have made to co-workers as he clocked out on December 29, 1997. Finally, the short period of time (less than 90 days) between the serving of the EEOC complaint on Bria and the adverse employment action is circumstantial evidence of causation. *See Wideman v. Wal-Mart Stores*, 141 F.3d 1453 (11th Cir. 1998). Thus, the undersigned magistrate judge concludes that Craig has presented sufficient evidence to establish a *prima facie* case of retaliation.

As noted above, the defendant asserts that, even if a *prima facie* case of retaliation has been established, it has presented a legitimate, non-discriminatory reason for firing plaintiff: job abandonment.

The burden now shifts back to the plaintiff to raise a genuine factual question as to whether the defendant's stated reason is mere pretext. *Hairston v. Gainesville Sun Publishing*, 9 F.3d 913, 920 (11th Cir. 1993). Plaintiff may succeed by directly persuading the court at trial that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *McDonnell Douglas v. Green*, 411 U.S. at 804-05, 93 S.Ct. at 1825-26. In order to establish pretext, plaintiff is not required to introduce

25

evidence beyond that already offered to establish the *prima facie* case. *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 732 (9th Cir. 1986). Evidence already introduced to establish the *prima facie* case may be considered, and "[i]ndeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation" and establish pretext. *Burdine*, 450 U.S. at 256, n.10, 101 S.Ct. at 1095, n.10. Accordingly, the grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable in Title VII cases in which the plaintiff has established a *prima facie* case of retaliation because of the "elusive factual question" of intentional discrimination. *Id.* at 256, 101 S.Ct. at 1095.

Plaintiff asserts that he was subjected to harassment for wearing an earring to work after he filed his EEOC complaint. He also states that after filing this complaint, he was subjected to threats of termination for allegedly failing to call in when absent from work due to his back injury. Plaintiff has offered evidence in support of his contention that he had not, in fact, violated the company work rule regarding absences, was never disciplined for this (or anything else), and that these threats amounted to harassment reflecting that the proffered reason for his termination is pretextual. He also presented evidence reflecting the inability of the defendant to support a claim it previously made--that plaintiff had told co-employees his lawyer told him he did not have to work late--as further evidence of pretext.

The burden to avoid summary judgment is not to show by a preponderance of the evidence that the reasons stated were pretext. Rather, plaintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the

26

evidence that the plaintiff has established pretext, and that the action taken was in retaliation for engaging in the protected activity. Issues of fact and sufficiency of evidence are properly reserved for the jury. The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue. *Hairston*, 9 F.3d at 920-21. The undersigned magistrate judge finds that plaintiff has succeeded in placing material facts at issue regarding his claim of retaliation.

Based upon the finding stated above, that plaintiff has failed to show he was disciplined more harshly for the same or substantially similar conduct as similarly-situated white employees, the undersigned magistrate judge finds that plaintiff has failed to establish a *prima facie* case of discrimination under Title VII. However, he has established a *prima facie* case of retaliatory discharge and submitted sufficient evidence that defendant's asserted legitimate, nondiscriminatory reason for his discharge was pretextual. Therefore, it is **ORDERED** that defendant's motion for summary judgment as to plaintiff's claim of discrimination under Title VII is **GRANTED**. It is further **ORDERED** that defendant's motion for summary judgment is **DENIED** with regard to plaintiff's claim of retaliation.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this ___22nd___ day of December, 1999.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

27